**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NINA COLBERT,
*o/b/o JVR, a minor,*

                               CASE NO. 2:18-cv-11050

         *Plaintiff,*             DISTRICT JUDGE PAUL D. BORMAN
                               MAGISTRATE JUDGE PATRICIA T. MORRIS

*v.*

COMMISSIONER OF SOCIAL SECURITY,

         *Defendant.*
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 12, 13)**

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff JVR[1] is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 12), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 13), be **GRANTED**, and this case be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) under

---

[1] As JVR is a minor, the suit is brought by her mother, Nina Colbert, on her behalf. For the sake of ease, however, I use "Plaintiff" to refer to JVR.

Title XVI, 42 U.S.C. §§ 1381-1383f. (R. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (R. 3). Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 12, 13).

Plaintiff filed one prior application for SSI, in 2010, which the Commissioner denied. (R. 7 at PageID.126). Plaintiff then filed suit in federal court; the Court dismissed the case on the Commissioner's motion for summary judgment, finding that the ALJ's decision had been supported by substantial evidence. *Colbert ex rel. JVR v. Comm'r of Soc. Sec.*, No. 13-13801, 2014 WL 3778243 (E.D. Mich. July 31, 2014). Plaintiff does not appear to have appealed further.

The application for SSI at issue in this case was filed on November 4, 2014, alleging onset in November 1, 2009. (R. 7 at PageID.219-224). Plaintiff's claim was denied at the initial level on January 12, 2015. (*Id.* at PageID.135). After an administrative hearing was held at Plaintiff's request, (*id.* at PageID.76-102), Administrative Law Judge (ALJ) Joy Turner found that she had not been disabled from the date the application was filed, through the date of the decision, July 18, 2016. (*Id.* at PageID.40-59). The Appeals Council denied Plaintiff's request for review. (*Id.* at PageID.34-39). This action followed. (R. 1).

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v.*

2

*Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). A child will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. §

1382(a)(3)(C)(I). To determine whether a child's impairment results in marked and severe limitations, SSA regulations prescribe a three-step sequential evaluation process:

1. A child will be found "not disabled" if she engages in substantial gainful activity.

2. A child will be found "not disabled" if she does not have a severe impairment or combination of impairments.

3. A child will be found "disabled" if she has an impairment or combination of impairments that "meets, medically equals, or functionally equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

20 C.F.R. § 416.924(a). In the third step of this analysis, the Commissioner assesses the functional limitations caused by the child's impairment(s). 20 C.F.R. § 416.926a(a). To determine functional equivalence, the regulations direct the Commissioner to evaluate how the child functions in six domains, which are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). These domains are:

1. Acquiring and using information;
2. Attending and completing tasks;
3. Interacting and relating with others;
4. Moving about and manipulating objects;
5. Caring for yourself; and
6. Health and physical well-being.

*Id.* If the child's impairments result in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairment functionally equals the listing and the child will be found disabled. 20 C.F.R. § 416.926a(d). A marked limitation is one that

"interferes seriously with [a child's] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An extreme limitation is one that "interferes *very* seriously with [a child's] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(3)(i) (italics added). "Marked" and "extreme" limitations in a given domain can be established by standardized test scores that are two or three standard deviations, respectively, below the mean—that is, either in the lowest 2.5 percent of the distribution or the lowest 1 percent—provided that the scores are representative of day-to-day functioning. 20 C.F.R. §§ 416.926a(e)(2)(iii), 416.926a(e)(3)(iii). Test scores are not conclusive, therefore, and the bulk of 20 C.F.R. § 416.926a is devoted to "general descriptions of each domain" against which a claimant's functioning may be compared.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been disabled, as defined in the Social Security Act, since the date the application was filed, September 30, 2014. (R. 7 at PageID.55). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant time. (*Id.* at PageID.46). She had the severe impairment of asthma, but her asthma did not meet or medically equal or functionally equal the severity of a listed impairment. (*Id.* at PageID.46-47). The ALJ determined that Plaintiff had no limitation in five of the six functional equivalence domains: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, or caring for herself, (*id.* at PageID.49-54); she had marked limitation in health and physical well-being, (*id.* at PageID.55). Because Plaintiff did not have an impairment or combination of impairments

5

that resulted in either "marked" limitations in two domains or "extreme" limitations in one, the ALJ found her not disabled since the application date. (*Id.*).

### E. Administrative Record

#### 1. Medical Evidence

Plaintiff visited the Pediatric Pulmonary Clinic somewhat regularly from 2012 through 2016. In the earliest record from the Pulmonary Clinic, on October 29, 2012, test results showed a mildly decreased $FEV_1$, interpreted as a mild obstructive defect with significant bronchodilator response. (*Id.* at PageID.519). Plaintiff was prescribed Albuterol, Singular, Advair, and Flonase. (*Id.* PageID.537).

In response to a call from Plaintiff's mother in November 2012, Dr. Lokesh Guglani at the Pulmonary Clinic gave her "only enough refills to last for a short period of time" and asked her to return for a follow-up 3 months after her prior appointment. (*Id.* at PageID.357).

Plaintiff next visited the Pulmonary Clinic on July 31, 2013; Dr. Guglani noted that Plaintiff had had "frequent ups and downs in her asthma course and treatment plan" since her last appointment, in October 2012. (*Id.* at PageID.356-357). Plaintiff had a nocturnal cough at least 2 nights per week, and an occasional cough during the day. (*Id.*). She also had "significant nasal congestion and nasal drainage" that caused post-nasal drip, which in turn caused a cough. (*Id.*). She had been using albuterol through an inhaler and nebulizer, and "has been able to keep her asthma under control"; when it did flare up, she needed albuterol every 4 to 6 hours for several days. (*Id.*). But she had "not been using any significant numbers of medications through the nebulizer." (*Id.*) She used her Singulair and

6

Advair regularly and correctly. (*Id.*). She had not been to the ER or needed any courses of steroids since her last appointment, nine months ago. (*Id.*). In the end, Dr. Guglani found Plaintiff had "had poorly controlled asthma for quite some time now. The lack of follow-up and inadequate delivery of the medications probably contributes to the severity of her asthma." (*Id.* at PageID.358).

A few months later, in October 2013, at another Pulmonary Clinic appointment, PA-C David Mowery observed Plaintiff had "moderate persistent asthmatic allergic rhinitis with poor adherence" and "current mild exacerbation." (*Id.* at PageID.360-361). Plaintiff's father reported that "her symptoms have increased and she is using Albuterol on a more frequent basis over the course of the last 10-14 days," but she was "getting relief from her current medical regimen" and there had been "no need for hospitalization or steroids up to this point." (*Id.* at PageID.360-361). Mowery instructed her to continue her current medications while emphasizing the "importance of good adherence to all medications," and also started her on daily Claritin for the allergic rhinitis and post nasal drip, and a five-day course of Prednisone with four times daily use of Albuterol. (*Id.* at PageID.361-362).

On May 27, 2014, Plaintiff went to the emergency room at St. John's Hospital for an acute asthma exacerbation and was given albuterol, Atrovent, and Decadron; on re-evaluation, she was "no longer wheezing" and was discharged the same day with a prescription for Decadron, albuterol nebulizers, and inhalers. (*Id.* at PageID.311).

Her next appointment at the Pulmonary Clinic was more than a year and a half after her last appointment and almost a year after her ER visit, on May 8, 2015. (*Id.* at PageID.403). According to Plaintiff's mother, she "did relatively well throughout the

7

winter and had only one asthma exacerbation that required a steroid burst"—recently, however, she had run out of her medications. (*Id.* at PageID.404). She was now coughing more, even with Albuterol treatments every 4 hours, and she had a cough every night. (*Id.*). Lab studies were "suggestive of a moderate degree of obstruction with positive bronchodilator response." (*Id.* at PageID.405). Because Dr. Guglani was concerned she was having an asthma exacerbation, and to "give time for her controller medications to start working again.," she prescribed a five-day course of Prednisone. (*Id.*) She also discussed with Plaintiff her "poor symptom perception," and instructed her "to pay more attention to the signals that her body is giving regarding her asthma symptoms." (*Id.*). She was to follow up every two months. (*Id.*).

Plaintiff returned to the Pulmonary Clinic on August 14, 2015 (about three months after the previous appointment). (*Id.* at PageID.372). She still had "intermittent respiratory symptoms" with wheezing, shortness of breath, and coughing episodes whenever she went outside, intensifying with activity. (*Id.* at PageID.373). She also had nocturnal symptoms two to three nights a week and intermittent chest pains with activity that subsided with albuterol. (*Id.*). She had been compliant with her medications. (*Id.*). Lab studies were "suggestive of a very mild obstructive pattern." (*Id.* at PageID.374) Her $FEV_1$ had improved by 5 percentage points from the last evaluation. (*Id.*). Dr. Guglani suggested adding Xolair as an additional controller for her asthma and to help reduce exacerbations and the need for additional courses of steroids. (*Id.*).

On January 24, 2016, Plaintiff again visited the ER for an asthma exacerbation. (*Id.* at PageID.479-484). On discharge, she was improved—alert and well hydrated, with no

wheezing. (*Id.* at PageID.485). A few days after, she went to the Pulmonology Clinic, where testing showed a moderate to severe degree of obstructive defect with positive bronchodilator responsiveness. (*Id.* at PageID.468, 473). Mowery discussed with Plaintiff and her family the importance of using a spacer or mask with all treatments, and told them to "pretreat with Albuterol prior to activity and with extreme weather exposure." (*Id.* at PageID.471). He switched her Advair for Symbicort and put her on a 5-day prednisone course. (*Id.*).

Plaintiff received her initial Xolair injection with Mowery on February 18, 2016, where Mowery noted she had "severe persistent asthma" but "has been doing well with intermittent symptoms associated with the weather and a recent cold." (*Id.* at PageID.491). She also received injections in February (*id.* at PageID.502) and March (*id.* at PageID.505), as well as in April; at her April appointment, Mowery also started her on a 5-day course of prednisone and four times daily Albuterol. (*Id.* at PageID.495).

State consultant Harold Nims, D.O., examined Plaintiff on December 16, 2014. (*Id.* at pageID.347). Plaintiff had been diagnosed with asthma at birth; at 9 years old, she had never been hospitalized for asthma, though she reported that she visited the emergency room about three times a year for asthma exacerbations. (*Id.*). Her asthma was triggered by weather changes, exercise, grass, carpets, and cats. (*Id.*). She attended gym class at school "but her activity during class [was] somewhat limited" because when the exercise became "too strenuous," she needed to stop and use her inhaler. (*Id.*). At the time, she was taking Singulair, Advair, Albuterol HFA (4 times per day), Albuterol nebulizer (every 4-6 hours); and prednisone (as needed for asthma exacerbations). Plaintiff's mother reported that her

ventilation treatment made her "quite jumpy" and decreased her attention span, but she had

a 4.0 grade point average and no significant behavioral problems. (*Id.* at PageID.348). The

final impression was moderate persistent asthma. (*Id.* at PageID.350).

Plaintiff also had two Well Child Exams, one in July 2014 and one in July 2015, as

well as a follow-up appointment about her asthma with the same provider in September

2014. (*Id.* at PageID. 345, 346, 615). The pages are poorly scanned and handwritten, and

therefore difficult to decipher, but they do make note of Plaintiff's asthma and food

allergies. (*Id.*).

### 2. School Records and Teacher Questionnaires

The record also contains documentation of Plaintiff's school attendance and

evaluations from some of her teachers. The report from Fisher Lower Academy shows 26

unexcused absences and 7 excused absences from September 4, 2012, through May 30,

2013. (*Id.* at PageID.529). The Chandler Park Academy Elementary attendance report

shows, between September 8, 2015, and May 17, 2016, 10 absences, 2 excused absences,

5 early dismissals, 2 days of suspension, and 59 days on which Plaintiff was tardy. (*Id.* at

PageID.534). In February 2013, her mother received a warning of her truancy. (*Id.* at

PageID.526). And a May 28, 2013 letter from Fisher Lower Academy and May 30, 2013

letter from the Country Prosecuting Attorney warned that Plaintiff had been absent more

than 10 times without a valid excuse, in violation of the Michigan Compulsory Attendance

Act. (*Id.* at PageID.527).

Six of Plaintiff's teachers at Chandler Park Academy Elementary submitted teacher

questionnaire forms. (*Id.* at PageID.556-603). Each taught Plaintiff for about fifty minutes

a day. (*Id.* at PageID.556, 565, 573, 581, 589, 597). None of them had noticed "an unusual degree of absenteeism." [2] (*Id.*) Nor did any of the six teachers seem aware that Plaintiff had asthma or used an inhaler or nebulizer. (*Id.* at PageID.562, 571, 579, 581, 595, 603).

Three of the teachers—Ms. Christina Oddo, Mr. Milton Buford, and Mrs. Magdalena Tkatchook—rated Plaintiff's limitations identically. They found that Plaintiff had no limitations in the domains of acquiring and using information, attending and completing tasks, or moving about and manipulating objects, (*Id.* at PageID.557-560, 566-570, 584-588), the teachers indicated that she had a slight problem expressing anger appropriately on a weekly basis. (*Id.* at PageID.559, 568, 586). But none of them had found it necessary to implement behavior modification strategies for her such as a behavior plan, time-out, or removal from the classroom. (*Id.*). The three teachers also reported that Plaintiff had problems in the domain of caring for herself: she had a slight problem handling frustration appropriately (weekly) and taking care of personal hygiene (monthly). (*Id.* at PageID.561, 570, 588).

A fourth teacher, Ms. Kelly Morrison, rated Plaintiff's limitations identically, except that she found Plaintiff had no problem taking care of her personal hygiene and had a slight problem using appropriate coping skills to meet the demands of the school environment on a weekly basis. (*Id.* at PageID.574-578).

---

[2] Five of the teachers marked that they had not noticed an unusual degree of absenteeism, (*Id.* at PageID.556, 565, 573, 581, 589), and one did not answer the question, (*id.* at PageID.597).

11

A fifth questionnaire was submitted by Chandler Park Academy Elementary teacher Grant Pachmayer. (*Id.* at PageID.589, 596). He found Plaintiff had no problems in the domains of acquiring and using information, attending and completing tasks, and moving about and manipulating objects. (*Id.* at PageID.590-591, 593). In the domain of interacting and relating with others, she had a "slight problem" making and keeping friends, expressing anger appropriately, using language appropriate to the situation and listener, and introducing and maintaining relevant and appropriate topics of conversation (all monthly). (*Id.* at PageID.592). He explained: "Student often discusses material that is too mature, however, occurs only monthly. Other than that no obvious problems." (*Id.*). He had not found it necessary to implement behavior modification strategies for her. (*Id.*). In the domain of caring for herself, she had a slight problem handling frustration appropriately (monthly) and an obvious problem taking care of personal hygiene (weekly). (*Id.* at PageID.593). But, he noted, Plaintiff had "gotten better at managing frustration with peers." (*Id.*). He marked that she did not frequently miss school due to illness, and closed by saying, "Child appears fine in all aspects of school routines." (*Id.*)

Ms. Kimberly Perrino submitted the sixth and final teacher questionnaire. (*Id.* at PageID.597). She indicated Plaintiff had no problems in the domains of acquiring and using information, attending and completing tasks, or moving about and manipulating objects. (*Id.* at PageID.598, 599, 601). In the domain of interacting and relating with others, Plaintiff had a slight problem (weekly) playing cooperatively with other children; making and keeping friends; using language appropriate to the situation and listener; interpreting the meaning of facial expressions, body language, hints, and sarcasm; and using adequate

12

vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (*Id.* at PageID.600). And she had an "obvious" problem expressing anger appropriately on a weekly basis. (*Id.*). But it had not been necessary to implement behavior modification strategies for her. (*Id.*). In the domain of caring for herself, Plaintiff had a slight problem handling frustration appropriately (weekly); responding appropriately to changes in her own mood (monthly); and using appropriate coping skills to meet the daily demands of the school environment (weekly). (*Id.* at PageID.602).

### 3.  Application Reports and Administrative Hearing

#### i.  Questionnaire for Children Claiming SSI Benefits

Plaintiff and her mother completed a Questionnaire for Children Claiming SSI Benefits on January 7, 2005. (R. 7 at PageID.240). At the time, Plaintiff was in fourth grade at Chandler Park Academy. (*Id.* at PageID.240). She was not in a special education program and the school did not make any special accommodations for her. (*Id.*). Nor did she receive any special counseling, tutoring therapy, exercises, or other services for her impairment. (*Id.* at PageID.241, 243). Plaintiff did not participate in any community or school activities such as choir, Scouts, or sports. (*Id.* at PageID.245).

She took the following medications on a regular basis: Advair, Ventolin, Singulair, Albuterol, and prednisone for asthma, and an Epi-Pen for allergic reactions. (*Id.*). Her medications "work[ed] okay but sometimes the doctors have to increase[] or change her medications because her symptoms sometimes got worse." (*Id.*).

### ii.  Asthma Form

Plaintiff's mother also completed an Asthma Form for her on November 22, 2014. (R. 7 at PageID.257-259). She indicated Plaintiff had not had any inpatient hospitalizations for asthma attacks in the past year, though she had gone to the emergency room at least once for an attack, in February 2014, where she had been given a breathing treatment and steroids. (R. 7 at PageID.257). She had also gone to a doctor's office or urgent care in September 2014 for an attack. (*Id.*).

Attacks were brought on by activities in school, a change of weather, being around someone sick, a "dirty house," and noncompliance with her medication. (*Id.*). Her asthma attacks lasted ten minutes to an hour, depending on their severity. (*Id.*).

To control her asthma, every day Plaintiff used her Advair inhaler twice and her Venolin inhaler four times, took one Singlair tablet, and used her breathing machine every four to six hours. (*Id.*). Between asthma attacks, she had shortness of breath, wheezing, and coughing. (*Id.* at PageID.259).

Plaintiff had last had breathing tests in October 2013 and was "overdue for appointment." (*Id.*). She was currently restricted from "[a]ll gym activities" for three months. (*Id.*). In addition, her mother indicated that her schools kept records of every time she had an asthma attack at school. (*Id.* at PageID.258). These school records do not appear in the record before the Court.

### iii.  Daily Activities

Plaintiff's mother also completed a form detailing her daily activities as of November 22, 2014. (R.7 at PageID.260-263). Plaintiff was 9 years old at the time. (*Id.* at

PageID.263). On a typical day, she would get ready for school and then attend school; she was "able to take breathing treatment and inhaler in school." (*Id.* at PageID.260). Plaintiff did not miss school regularly. (*Id.* at PageID.261). She was restricted form participating in gym. (*Id.*).

When not in school, Plaintiff watched television, played video games, visited her neighbors, and did light house chores. (*Id.* at PageID.260). She had four siblings: a 15 year old she argued with "all the time," a 5 year old she argued with "most of the time," and 4 and 2 year olds she "gets along" with. (*Id.*). Asked whether Plaintiff had any "problem behavior," her mother answered: "She just argue a lot runs her mouth negative all the time." (*Id.*). And "[d]epending on the weather," she sometimes had "problems getting [along] with others," like her siblings, because her medications caused mood swings. (*Id.*).

Plaintiff was expected to help with household chores by putting things away and washing dishes, unless she was recovering from an asthma attack. (*Id.* at PageID.261). She was able to care for personal needs such as bathing, dressing, and using the toilet as well as others her age. (*Id.*). But she needed help and repeated instructions "all the time" because she did not "take time or remember." (*Id.*). Her speech could be understood both by people who knew her well and those who didn't, though she was unable to answer the phone or deliver phone messages because she would forge what to say. (*Id.*).

Plaintiff could prepare food such as sandwiches or cereal daily, though she would "forget to clean up behind herself all the time"; she helped fix food requiring mixing and cooking monthly, though sometimes she would "start to do things without asking," and she planned and prepared an entire meal monthly, though sometimes she used too much of the

15

ingredients. (*Id.* at PageID.262). In addition, she set the table daily, though she sometimes forgot to wipe the table. (*Id.*). She also wrote letters monthly. (*Id.*). Plaintiff never baby-sat for other children, did laundry, mowed the lawn or shoveled snow, or participated in clubs or organizations; nor did she dust, sweep, vacuum, or mop her own room. (*Id.* at PageID.262-263).

Monthly, she used public transportation without issue. (*Id.* at PageID.263). She could also sometimes make change for $5 (though she sometimes lost money) and weekly read books or magazines. (*Id.*). And she shopped for junk food and shoes. (*Id.*).

Finally, her mother noted that "no one likes to keep her" because they were "scared" and would "panic[] when she has an attack." (*Id.*).

### iv.  The Testimony of Plaintiff and Her Mother at the Hearing

An administrative hearing was held in Plaintiff's case on May 18, 2016. (R. 7 at PageID.77-102). Plaintiff and her mother, Nina Colbert, both testified.

Plaintiff was in fifth grade at the time of the hearing and doing "[g]ood" in school. (*Id.* at PageID.82). She agreed that she missed a lot of school, usually for doctor's appointments or hospital visits for her asthma. (*Id.* at PageID.82-83). But she insisted, "My asthma doesn't affect my grades." (*Id.* at PageID.83). She had a 3.5 grade average and was an Honor Roll student. (*Id.* at PageID.99).

Plaintiff's mother explained that Plaintiff had lived with her since birth. (*Id.* at PageID.83). Plaintiff was three out of seven children, six of whom lived together in her home. (*Id.* at PageID.84). Besides asthma, she also had food allergies. (*Id.*). She had not

16

been hospitalized for her asthma before, though she had made multiple trips to the emergency room. (*Id.*).

She used her breathing treatments every four to six hours and whenever she felt her chest tightening; she used a nebulizing treatment twice a day, on average. (*Id.* at PageID.98). As for her inhalers, she used Symbicort twice a day and Albuterol four times a day. (*Id.*). In addition to the previously listed medications, Plaintiff had also been receiving Xolair injections since February 2016. (*Id.* at PageID.85). As for side effects, when Plaintiff first started the injections, she had had "a little hair loss but it stopped," and she had gained over 30 pounds and had trouble sleeping "because of the jitters from the medication." (*Id.* at PageID.86, 92).

Her asthma also disturbed her sleep—about once a week she woke up coughing, (*id.* at PageID.92), and once a week her mother had to wake her up for a breathing treatment (though before she had started taking Xolair, "it was like three to four times a week"), (*id.* at PageID.100). After the breathing treatment, it took her an hour and a half to two hours to go to sleep. (*Id.* at PageID.99). About three days a week, Plaintiff felt sluggish or weak when she woke up, but other days she felt "up and ready to go." (*Id.* at PageID.92-93).

Further, Plaintiff was often late to school because her family did not have transportation, so she had to walk, and she needed to take her time to avoid an asthma attack. (*Id.*). She got short of breath and had to stop on most days. (*Id.* at PageID.93-94). At her previous school, she had had 26 absences, 7 of which were excused, over the course of almost 3 years; on the unexcused occasions, her mother explained, she "just didn't send her with a note" because she "forgot or [Plaintiff] misplaced them or, you know, something

like that." (*Id.* at PageID.87). Her current school did not distinguish between excused and unexcused absences. (*Id.*).

When she missed school for doctor's appointments or otherwise due to asthma, she said, "I feel sad or mad sometimes because I'm missing out on education or I'm like, I feel sad because I'm not myself or I don't get to play with other kids or I'm not like other kids." (*Id.* at PageID.94). Physically, on days when she stayed home, she felt tired, her chest was tight, and she coughed and wheezed. (*Id.* at PageID.95). She stayed in her room and drew, took breathing treatments, watched television, or tried to do homework. (*Id.* at PageID.95).

Plaintiff did not have friends "like she should for her age," her mother said, because "[a] lot of the things that the other girls participate in, she cannot"—for example, cheerleading, bike riding, and skating. (*Id.* at PageID.88). Her friends on the playground would "try to have activities for [her] to play with them, but most activities" she could not do. (*Id.*). She and her siblings had "their ups and downs." (*Id.* at PageID.89). While her brothers and sisters were riding bicycles outside, she would watch them or water the plants or stay inside and watch television. (*Id.* at PageID.93).

Plaintiff's teachers sometimes complained she was "very talkative" and had "excessive energy," but they tried to work with her and get her "some exercise but not like the other children." (*Id.* at PageID.90). For example, Plaintiff would go to the nurse's office before gym and use her inhaler, walk around the gym instead of running, and stop playing basketball when she felt her chest "tightening up." (*Id.* ) Then she would sit down or go to the nurse to use her inhaler. (*Id.*). Sometimes she would not participate in gym activities

because she did not want to risk triggering her asthma. (*Id.*). But she was able to participate in less strenuous activities like church and Bible study. (*Id.*).

Since Plaintiff had started getting the injections several months prior, she had not needed to visit the emergency room. (*Id.* at PageID.89). She had had four absences, two of which were due to a suspension for arguing with another student. (*Id.* at PageID.91). And she had been late to school 11 days in March, 4 days in April, and 3 in May. (*Id.* at PageID.90).

Plaintiff testified, however, that since she had started taking the shots she felt "depressed sometimes" or "mad for no reason" or "like I just want to cry." (*Id.* at PageID.95). She had not told her mother or doctor because "it's emotion, so people are going to go through emotions sometimes." (*Id.* at PageID.95-96). She felt the shots had improved her breathing, but not the coughing and wheezing. (*Id.* at PageID.96).

When Plaintiff was younger, her mother testified, she would wait until the last minute to tell someone when her asthma was acting up, but she was now better about telling someone. (*Id.* at PageID.96-97). She had been on steroids three or four times so far that year, once since starting the Xolair injections. (*Id.* at PageID.97). Plaintiff's mother had noticed some improvement with the injections—for example, changes in the weather and freshly cut grass no longer caused asthma flare-ups. (*Id.*).

Plaintiff also had allergic rhinitis, for which she took Loratadine and Flonase. (*Id.*).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories:

"acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to

"other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544.[3] The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

---

[3] As Plaintiff's claim was filed before March 27, 2017, he continues to receive the benefit of the "treating source rule" found in § 404.1527. For claims filed on or after that date, the rules in § 404.1520c apply instead. 20 C.F.R. § 404.1527.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242.

For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination[4]—can be

---

[4] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

### G. Analysis

Plaintiff seeks remand, arguing the ALJ erred by: (1) finding her impairment did not functionally equal the listing and that her domain of health and physical well-being was not extremely limited; (2) not obtaining an updated consultative examination or consulting a medical advisor at the hearing; (3) failing to consider the "whole child" when determining functional equivalence. (R. 12). Defendant, on the other hand, asserts the Court should affirm the Commissioner's decision because it is supported by substantial evidence. (R. 13). Defendant counters Plaintiff's arguments and contends that the ALJ (1) properly found Plaintiff's asthma did not cause an extreme limitation in her health and physical well-being; (2) the ALJ was not required to obtain an updated consultative examination or opinion on medical equivalence; (3) the ALJ provided sufficient detail to show she properly considered "the whole child." (*Id.*).

### 1. Res Judicata and *Earley*

As an initial matter, I will address the issue of *res judicata* and the effect of the Sixth Circuit decision's in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018).

About twenty years ago, the Sixth Circuit held that the "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997). The Social Security Administration then issued an Acquiescence Ruling on *Drummond*:

23

> When adjudicating a subsequent disability claim with an adjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim . . . unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or ruling affecting the finding or the method for arriving at the finding.

S.S.R. 98-4(6), 1998 WL 283902 (June 1, 1998).

Recently, however, the Sixth Circuit clarified the meaning of *Drummond*. In *Earley*, a Social Security Administration ALJ had thought *Drummond* precluded him from revisiting an earlier finding that the claimant was not disabled unless she offered new and material evidence of a changed condition. *Earley*, 893 F.3d at 931. But "[t]hat is not how it works." *Id.* at 932. Rather, the Sixth Circuit explained, "[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory condition." *Id.*

Courts applying *Earley* to litigation that arose before that case have asked whether the ALJ, despite following *Drummond*, gave the new evidence a fresh look. If so, then the ALJ's decision satisfied the mandates of *Earley*; if not, then remand was appropriate. *See Dugan v. Comm'r of Soc. Sec.*, __ F. App'x __, 2018 WL 2769401 (6th Cir. 2018) (post-*Earley* Sixth Circuit decision finding ALJ pre-*Earley* appropriately considered administrative *res judicata* where she ultimately found new and material evidence of medical improvement meant she was not bound by a prior ALJ's determination); *Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 4403418, at *2–3 (E.D. Mich. Sept. 17, 2018) (overruling objection and adopting R&R affirming Commissioner where ALJ had

24

issued decision pre-*Earley* but still conducted an independent review of the evidence and did not simply adopt prior ALJ's findings wholesale); *Kimball v. Comm'r of Soc. Sec.*, No. 17-12659, 2018 WL 4102845, at *5 n. 4 (E.D. Mich. Aug. 7, 2018) (finding *Earley* did not change its analysis of pre-*Earley* ALJ decision because ALJ had concluded she was not bound by the previous RFC due to new and material evidence), *rep. & rec. adopted*, 2018 WL 4095081 (Aug. 28, 2016). *Cf. Seabolt v. Berryhill*, No. 3:17-CV-470, 2018 WL 3545382, at *3 at n. 4 (N.D. Ind. July 23, 2016) (finding that "*Earley* had not been decided when the ALJ opined on Seabolt's case and therefore does not control this Court's analysis of the ALJ's decision").

Here, the ALJ recognized in her opinion that *Drummond* was the current case law in the circuit at the time, and that therefore the prior finding on Plaintiff's RFC would be binding absent new and additional evidence or changed circumstances since the prior hearing. (R. 7 at PageID.43). But the ALJ went on to find that evidence "following this [earlier] decision shows greater physical limitations in the claimant, which warrant different findings on the present claim," and found that "[b]ecause of this new and material evidence, the undersigned is not bound by the prior decision." (PageID.43).[5] Thus, she did not adopt the prior findings, but instead engaged in a "fresh review of a new application for a new period of time," *Earley*, 893 F.3d at 934. (*Id.* at Page ID # 49-60). I suggest that

---

[5] The ALJ does include the arguably contrary sentence: "While I have considered all of the medical records, I attributed less weight to the evidence of disability prior to April 10, 2012, since the issue of disability is *res judicata* up to that time." (R. 7 at PageID.43). Since the remainder of the ALJ's explanation makes clear she did not consider herself bound by the prior decision, I suggest this lone sentence does not require remand under *Earley*.

satisfies the mandates of *Earley*, and agree with Defendant, (R. 15 at Page ID # 610, n. 2) that *res judicata* did not bar the imposition of a different RFC than in the prior decision.

### 2. The Extent of Plaintiff's Limitations in the Domain of Health and Physical Well-Being

For a claimant to functionally equal the listings, she must establish "marked" limitations in two of the domains outlined above, or "extreme" limitations in one. 20 C.F.R. § 416.926a(d). Here, the ALJ found that Plaintiff had "marked" limitations in the domain of "health and physical well-being," and no limitations in any other domain.[6] (R. 7 at PageID.49-55). Plaintiff asserts the ALJ should have found instead that she had "extreme" limitations in the domain of health and physical well-being, so that she would functionally equal the listing for asthma. (R. 12 at PageID.667).

The health and physical well-being domain considers "the cumulative physical effects of [a claimant's] physical or mental impairments and their associated treatments or therapies on [the claimant's] functioning." 20 C.F.R. § 416.926a (eff. June 13, 2011 to June 11, 2015).

A child has a "marked" limitation in a domain when her impairment "interferes seriously" with her "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). The ALJ found that Plaintiff had marked limitations here based

---

[6] The ALJ found that Plaintiff had "less than marked limitation" in moving and manipulating objects, (R. 7 at PageID.52-53), and no limitations in the remaining domains, (*id.* at PageID.49-52, 53-54). Plaintiff does not challenge the ALJ's findings in the five other domains, and so the Court will limit its consideration to the domain of health and physical well-being. *See Hollon ex rel Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490-91 (6th Cir. 1990) "[W]e limit our consideration to the particular points that Hollon appears to raise in her brief on appeal.").

on her "longstanding history of moderate to severe asthma," her "numerous absences during 2015/2016 school year" due to asthma, and that "[d]ue to progressive asthma symptoms, the claimant began Xolair injections in February 2016 along with continued breathing treatments and albuterol inhalers." (*Id.* at PageID.55).

A child has an "extreme" limitation, on the other hand, when her impairment interferes "very seriously" with her "ability to independently initiate, sustain, or complete activities." *Id.* at (e)(3). Further, for the Commissioner to find "extreme" limitations in the domain of health and physical well-being, a claimant's "impairment(s) should meet or medically equal the requirements of a listing in most cases." *Id.*

In this case, the relevant Listing is 103.03, for asthma. At the time of the ALJ's decision, the Listing required either:

(A) $FEV_1$ equal to or less than the value specified in table I of 103.02A; or

(B) attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year; or

(C) persistent low-grade wheezing between acute attacks or absence or extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with either (1) persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease, or (2) short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period; or

(D) growth impairment as described in 100.00.

27

20 C.F.R. Part 404, Subpt. P, App'x 1-Part-B1, 103.03(A)-(D) (eff. Feb. 26, 2014 to Dec. 8, 2014).

But as the ALJ explained, Plaintiff's asthma did not meet or medically equal that Listing. (R. 7 at PageID.47). The medical evidence did not demonstrate $FEV_1$ levels equal to or less than those listed in 103.02A; persistent low-grade wheezing between acute attacks or an absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators; or growth impairment. (*Id.*). Nor did the record demonstrate asthma attacks—as defined in 3.00C, prolonged symptomatic episodes lasting one or more days and requiring intensive treatment—in spite of prescribed treatment and requiring physician intervention that occurred at least once every two months or six times a year. (*Id.*).

Plaintiff has not identified any evidence to the contrary. Nor does she explain how monthly scheduled injections and the need for a course of steroids no more than three times per year medically equals the listing requirement.[7] Instead, Plaintiff points to almost exactly the same evidence that led the ALJ to decide that she had only marked impairment: that Plaintiff has "missed multiple days of school due to her asthma," is restricted from participating in physical activity such as gym class, has needed Prednisone and breathing treatments for asthma exacerbations on "several occasions," and needs monthly injections, which cause the side effects of weight gain and symptoms of depression. (R. 12 at

---

[7] A review of the record reveals that Plaintiff received one course of steroids in 2012 (R. 7 at PageID.537), one in 2013 (*id.* at PageID.361-362), one in 2015 (*id.* at PageID.372), and three in 2016 (*id.* at PageID.485, 471, 495).

PageID.661). Plaintiff does not seem to allege that the ALJ mischaracterized the evidence or ignored material evidence. Rather, she seems to be asking the Court to weigh the evidence more favorably to her, which it cannot do. *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) ("Our task is not to reweigh the evidence. That is solely the province of the Secretary.").

Thus, I suggest substantial evidence supports the ALJ's decision that Plaintiff has marked, not extreme, limitations in the domain of health and physical well-being.

### 3. Requirement to Obtain an Updated Consultative Examination or Opinion on Medical Equivalence

Second, Plaintiff argues the ALJ erred by not calling a medical advisor to the hearing or ordering an updated consultative examination, when "voluminous new medical evidence" had been added to the record since the December 16, 2014, consultative examination in the record. (R. 12 at PageID.661). Plaintiff suggests an updated medical opinion was required under SSR 96-6p, 1996 WL 274180,[8] because "the longitudinal medical evidence from Children's Hospital Pediatric Pulmonary Clinic documents a worsening of her asthma to the extent she required" Xolair injections. (*Id.* at PageID.662-63).

Defendant counters that SSR 96-6p applies only to *medical* equivalence, *not* functional equivalence. (R. 13 at PageID.690). Plaintiff does not allege the ALJ erred in determining medical equivalence, only *functional* equivalence, so SSR 96-6p would seem

---

[8] SSR 96-6p was rescinded and replaced by SSR 17-2p effective March 27, 2017, but SSR 96-6p remained in effect at all relevant times in this case.

inapposite—but I would suggest that is not reason to dismiss her argument entirely since, as discussed above, a claimant alleging extreme limitations in the sixth domain usually must show medical equivalence anyway. SSR 09-1p, 2009 WL 396031, at \*12 (Feb. 17, 2009) ("While SSR 96-6p requires that an ALJ . . . must obtain an updated medical expert opinion before making a decision of disability based on medical equivalence, there is no such requirement for decisions of disability based on functional equivalence.")

Regardless, I suggest SSR 96-6p does not mandate remand here. The regulation requires an updated medical opinion when: (1) "in the opinion of the [ALJ] or the Appeals Council," record evidence suggests a judgment of equivalence "may be reasonable"; or (2) additional medical evidence is received that, "in the opinion of the [ALJ] or the Appeals Council," may change the state agency consultant's finding on equivalence. SSR 96-6p (S.S.A.), 1996 WL 374180, at \*3-4.

The Court reasons: "There will always be a gap between the time the agency experts review the record and give their opinion with respect to the Listing and the time the hearing is issued." *Kelly ex rel. Hollowell v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009). Thus, "[a]bsent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand." *Id.*; *see Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 723 (6th Cir. 2012) ("Claimant thus must demonstrate either that the [new evidence] suggest[s] that she qualified as mentally retarded under [the listing] or that the ALJ believed the [evidence] may have changed the experts' findings.").

30

Here, Plaintiff fails to explain how the new records suggest she equals a listing, or to allege that the ALJ believed the evidence may have changed the state agency consultant's opinion on equivalence. She says only: "Clearly, the progressive worsening of a chronic condition, such as JVR's severe asthma, including the need for monthly injections and repeated use of steroids, is information that could impact the prior findings of the medical expert." (R. 12 at PageID.662). As discussed previously, Plaintiff does not elaborate on how monthly scheduled injections and the need for a course of steroids approximately two times per year medically equals the listing requirements.

Besides, the ALJ herself considered and accounted for the new evidence: She recognized that "[d]ue to progressive asthma symptoms, the claimant began Xolair injections in February 2016 along with continued breathing treatments and albuterol inhalers." (R. 7 at PageID.55) (internal citation omitted). She therefore gave little weight to the state agency opinions and found Plaintiff to have a marked limitation in health and physical well-being. (*Id.*). *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (holding an ALJ did not err in relying on state agency physician opinions that were not based on the entire record because the ALJ "took into account any relevant changes in [Plaintiff's] condition").

Lastly, although Plaintiff focuses almost exclusively on her need for Xolair injections, other evidence also post-dates the state agency physician's review on January 12, 2015. (R. 7 at PageID.125-134). Defendant says, however, that much of what Plaintiff describes as "voluminous new medical evidence" is duplicative, irrelevant, or unhelpful to Plaintiff. (R. 13 at PageID.689). Aside from the Xolair injections, that evidence also

includes a September 28, 2015 "Well Child Visit" (again, handwritten and difficult to decipher), (R. 7 at PageID.615), appointments at the Pulmonary Clinic in May and August 2015, (*id.* at PageID.403, 372), a single ER visit in January 2016 for an asthma exacerbation, (*id.* at PageID.479-484), and the six teacher questionnaires, (*id.* PageID.556-603). As Plaintiff does not make any attempt to engage with this evidence or argue that it shows Plaintiff may meet or medically equal the Listing or that the ALJ believed the evidence would change the opinion of the state agency physician on equivalence, I suggest Plaintiff did not err by not obtaining an updated medical opinion on medical equivalence.

### 4. "The Whole Child"

When determining functional equivalence, the ALJ "starts with a consideration of actual functioning in all settings," which the regulations term the "whole child" approach. SSR 09-1P (S.S.A.), 2009 WL 396031, at *2. An ALJ will consider the following questions: (1) How does the child function? (2) Which domains are involved in performing the activities? (3) Could the child's medically determinable impairment(s) account for limitations in the child's activities? (4) To what degree does the impairment(s) limit the child's ability to function age-appropriately in each domain? SSR 09-1p, 2009 WL 396031, at *2-3.

The ALJ then determines the child's limitation in a given domain "based on the answers" to five questions:

> 1. How many of the child's activities in the domain are limited (for example, one, few, several, many, or all)?
>
> 2. How important are the limited activities to the child's age-appropriate functioning (for example, basic, marginally important, or essential)?

32

3. How frequently do the activities occur and how frequently are they limited (for example, daily, once a week, or only occasionally)?

4. Where do the limitations occur (for example, only at home or in all settings)?

5. What factors are involved in the limited activities (for example, does the child receive support from a person, medication, treatment, device, or structured/supportive setting?

*Id.* at *9. Plaintiff seems to allege the ALJ erred by not explicitly answering those questions: "[T]he ALJ failed to ask any of the question outlined within SSR 09-01p. . . . [and] she failed to rate JVR's limitations in a domain based on the answers to questions 1 through 5 . . . ." (Doc. 12 at PageID.664-665). But the regulations "do not require [ALJs] to discuss all of the [listed] considerations . . . in their determinations and decision, only to provide sufficient detail so that any subsequent reviewers can understand how they made their findings." *Id.* at 3.

Here, the ALJ acknowledged Plaintiff's "longstanding history of asthma with associated symptoms including shortness of breath, wheezing, and dyspnea," (R. 7 at PageID.48), as well as that she had begun Xolair injections for "progressive asthma symptoms," on top of continued breathing treatments and albuterol inhalers, (*id.* at PageID.55). She recounted the testimony of Plaintiff and her mother that Plaintiff had to walk slowly on the way to school and could not participate in activities like cheerleading, bike riding, or skating, and that Plaintiff was restricted from gym class. (*Id.* at PageID.53). And she considered Plaintiff's "numerous absences" during the 2015-2016 school year, which Plaintiff testified were due to asthma. (*Id.* at PageID.55). But the ALJ also noted that Plaintiff testified her asthma did not affect her education, (R. 7 at PageID.50),

Plaintiff's mother reported she kept up with her chores and got along with her younger siblings, (R. 7 at PageID.51-52), and Plaintiff's teachers indicated she was able to play cooperatively with other children and follow rules, (R. 7 at PageID.52).

Plaintiff asserts that the ALJ "did not provide sufficient detail to show that she had, indeed, considered the whole child," but puts forward essentially the same evidence that the ALJ explicitly considered, including that her asthma limits her ability to participate in physical activities like riding a bicycle or gym class, causes numerous absences, and requires treatment with preventative medication, breathing treatments, inhalers, and Xolair shots, as well as steroids for exacerbations. (R. 12 at PageID.665-666). To the extent that Plaintiff wishes the Court to weight that evidence more heavily than the ALJ had, I must decline. *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) ("Our task is not to reweigh the evidence. That is solely the province of the Secretary.").

For the above reasons, I suggest that the ALJ properly considered "the whole child."

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (R. 12), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 13), be **GRANTED**, and this case be **AFFIRMED**.

### III.  REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed.

34

R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  March 27, 2019                                    S/ PATRICIA T. MORRIS
                                                         Patricia T. Morris
                                                         United States Magistrate Judge

## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: March 27, 2019                    By s/Kristen Castaneda
                                         Case Manager